IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

DEMETRYE WILKINS,                           3:17-cv-01099-BR

            Plaintiff,                      OPINION AND ORDER

v.

BRANDMAN UNIVERSITY,

            Defendant.


**BETH ANN CREIGHTON**
**LAURA KOISTINEN**
Creighton & Rose, PC
Powers Building
65 S.W. Yamhill Street, Suite 300
Portland, OR 97204
(503) 221-1792

            Attorneys for Plaintiff

**J. MICHAEL PORTER**
**MATTHEW A. TRIPP**
Miller Nash Graham & Dunn LLP
111 S.W. Fifth Avenue
Suite 3400
Portland, OR 97204
(503) 224-5858

            Attorneys for Defendant

**BROWN, Senior Judge.**

This matter comes before the Court on Defendant's Motion (#51) for Summary Judgment.  The Court concludes the record is sufficiently developed to resolve this Motion without oral argument.  For the reasons that follow, the Court **GRANTS** Defendant's Motion and **DISMISSES** this matter **with prejudice.**

<u>**BACKGROUND**</u>

The following facts are taken from the parties' Joint Statement of Agreed Facts (JSAF) and the parties' filings related to Defendant's Motion for Summary Judgment and are undisputed unless otherwise indicated.

Defendant Brandman University hired Plaintiff Demetrye Wilkins as an enrollment coach on October 13, 2014.  It is undisputed that Defendant has a 180-day probationary period during which enrollment coaches learn how to perform their jobs but are also expected to reach the goals set by Defendant.

At the time he was hired Plaintiff's supervisor was Felicia Royce, Assistant Director of Enrollment Services.  At some point in the summer of 2015 Enrollment Coach Laura Mumford was promoted to Assistant Director of Enrollment Services and became Plaintiff's direct supervisor.

In early June 2015 Mumford and Dana Gelfand, Associate Vice Chancellor of Enrollment Operations, began working with Madiha

Chughtai, Human Resources Manager, to draft a Disciplinary Counseling Memorandum regarding Plaintiff's job performance.

During the time Mumford, Gelfand, and Chughtai were working on the Disciplinary Counseling Memorandum Gelfand received reports from several staff members that Plaintiff may have been manipulating "call data." Gelfand brought the reports to Chughtai's attention. Chughtai recommended issuing the Disciplinary Counseling Memorandum to Plaintiff while Gelfand reviewed the relevant call data.

On June 10, 2015, Mumford and Gelfand issued a Disciplinary Counseling Memorandum to Plaintiff regarding "unsatisfactory job performance," which constituted a "written notice of disciplinary action." Decl. of Matthew Tripp, Ex. 15 at 1. Mumford and Gelfand set out a number of deficiencies in Plaintiff's performance that included giving inaccurate information to students that caused them to complain and that required other staff members to provide the students with correct information and guidance; failing "to be available for warm transfers"; being overdue on following up with a significant percentage of his "student pipeline"; failing to meet the team's average call metrics for wait time, warm transfers, call volume, and call time; failing to complete his weekly evaluation "scorecards"; and his unsatisfactory attendance. Mumford and Gelfand provided Plaintiff with a plan for corrective action that required him to

"ensure accurate information is provided in every student interaction"; to use the sales framework established by the department and to "score a minimum of 2 on all of the skills evaluated"; to improve to "at least the team average for wait time, warm transfers, call volume, and call time"; and to adhere to his attendance requirements. Tripp Decl., Ex. 15 at 4. Mumford and Gelfand also advised Plaintiff that they had been "notified of concerns that some staff members have with your communication. Demetrye, you are expected to use professional language and display a professional and respectful demeanor at all times in the workplace. We also ask that you respect other coworkers who do not want to engage in discussions." *Id.* Finally, Mumford and Gelfand advised Plaintiff that

> [t]his written warning serves as notice that your pattern of unsatisfactory job performance must improve immediately. During the next 30 days, we'll be carefully monitoring your performance, and we'll take appropriate action during or following this period in accordance with the degree of progress you make. If you do not immediately improve your job performance and sustain it at an acceptable level, or if there are any other job performance problems, this may result in further disciplinary action, including termination. Failure to comply with the plan for corrective action or any future violations of Brandman's policies, job requirements and/or procedures may result in further disciplinary action including termination.

Tripp Decl., Ex. 15 at 5. Plaintiff did not include any comments in the employee comments section of the Memorandum. Plaintiff and Mumford signed the Memorandum on June 10, 2015.

Gelfand investigated the issue of Plaintiff's alleged manipulation of call metrics and discovered evidence that, according to Gelfand, established Plaintiff was intentionally manipulating his call data to make his performance appear to be better. Specifically, Gelfand discovered Plaintiff had made 39 calls to a "nonviable number"; "failed to disconnect from some calls when they were over, which would increase [Plaintiff's] talk time"; and "dispositioned at least one call 'successful,' which represents that he actually spoke to the student, when he had in fact only left a voicemail." JSAF at ¶ 41.

Mumford was on vacation from June 29, 2015, through July 10, 2015. Mumford instructed Plaintiff to send "daily recaps" to Gelfand while Mumford was gone, and Plaintiff, therefore, sent his daily recaps to Gelfand the week of June 29, 2015. Mumford, however, did not advise Plaintiff to send his daily recaps to another individual if Gelfand was not in the office. Thus, because Gelfand was out of the office the week of July 6, 2015, Plaintiff did not send his daily recaps to anyone that week.

On July 21, 2015, Mumford and Gelfand sent a second Disciplinary Counseling Memorandum to Plaintiff in which they reiterated their concerns with Plaintiff's performance as set out in the June 10, 2015, Disciplinary Counseling Memorandum and also advised Plaintiff:

> Upon further investigation, we have determined
> that you have not been accurately dispositioning

> your calls.  Data that was pulled showed that you
> dispositioned calls as "successful", when you
> actually left voicemails.  In addition, there were
> approximately 39 calls made to one not viable
> number over a period or a few weeks which
> increased your call metrics.  Furthermore, there
> were calls that you made where you did not
> disconnect and the call time recorded for that
> entire length of time, increasing your call time.
> Given this additional information, the nature of
> the Written Notice of disciplinary Action is being
> modified to a Final Written Notice.

Tripp Decl., Ex. 8 at 1.  Mumford and Gelfand also noted

Plaintiff's "job performance has not adequately improved [in] the

areas identified" in the June 10, 2015, Memorandum.  *Id*. at 2.

Specifically, Plaintiff failed to meet his student-conversion

target; failed to meet his "score target" for "quality student

interactions/consultative sales"; and failed to meet the team

average for wait time, warm transfers, call volume, and call

time.  *Id*.  Finally, they noted "[o]n 6/25 you had to be reminded

by your AD to send the daily recap as you had not submitted it 3

days in a row.  On 7/13 you were notified that you neglected to

submit it for a full week during the absence of your AD."  *Id*.

The Disciplinary Counseling Memorandum included a plan for

corrective action and noted:

> This final written warning serves as notice that
> your pattern of unsatisfactory job performance
> must improve immediately.  If you do not
> immediately improve your job performance and
> sustain it al an acceptable level, or if there are
> any other job performance problems, your
> employment with Brandman will be terminated.
> Failure to comply with the plan for corrective
> action or any future violations of Brand man's

policies, job requirements and/or procedures will
result In termination.

*Id*. at 3.  After reviewing the Memorandum, Plaintiff disputed in
the section reserved for employee comments that he dispositioned
calls as successful when he actually merely left voicemails and
that he made 39 calls to a "nonviable number."  Plaintiff also
stated he would like to see the evidence supporting the
allegations that he disputed.  As to the allegations that he
failed to submit his daily recaps for the week of July 13, 2015,
Plaintiff pointed out that he had not been "assigned anyone to
submit [his] recap" for that week.  Tripp Decl., Ex. 8 at 3.
Plaintiff and Mumford signed the Memorandum with Plaintiff's
comments on July 21, 2015.

Chughtai states in her Declaration that Plaintiff "made the
same complaints" to her that Plaintiff set out in the employee
comment section of the July 21, 2015, Memorandum, and she
"conducted a thorough inquiry into [his] complaints."  Decl. of
Madiha Chughtai at ¶ 8.  Ultimately,

>[a]lthough it was clear that [Plaintiff] had made
>39 calls to a nonviable number, my investigation
>determined that the number was on a student record
>in the dialer system each time Wilkins called it.
>
>I removed the reference to the 39 calls from the
>final counseling memorandum in order to give
>[Plaintiff] the benefit of the doubt that he did
>not know how to change the nonviable number in the
>system.

Chughtai Decl. at ¶¶ 9-10.

On August 4, 2015, Mumford and Gelfand issued a revised final Disciplinary Counseling Memorandum to Plaintiff in which they reiterated the same points set out in the July 21, 2015, Memorandum regarding Plaintiff's performance except as to the 39 alleged calls. Specifically, Mumford and Gelfand now noted:

> Upon further investigation, we have determined that you have not been accurately dispositioning your calls. Data that was pulled showed that you dispositioned calls as "successful", when you actually left voicemalls. Furthermore, there were calls that you made where you did not disconnect and the call time recorded for that entire length of time, increasing your call time. Given this additional information, the nature of the Written Notice of disciplinary Action is being modified to a Final Written Notice.

Decl. of [Plaintiff's] Counsel, Ex. 16 at 1.

In response to the August 4, 2015, Disciplinary Counseling Memorandum Plaintiff provided a Memorandum to the "Brandman Management Team" on August 6, 2015, in which he stated:

> From my written notice, until my now final notice. I've experienced nothing but bias and a lack of ethics. Holly Williams and Julie Noyes two Caucasian employees were both put on written notices (I believe one was on her final) and taken off in a short manner of time. A fellow coworker, Chris Wilhite has missed 20+ days of work, has 100+ post due student in status for a few weeks and hasn't so much as been given a written notice. So, in this instance I feel like I'm being singled out and discriminated against.
>
> I feel there is a double standard, which makes for a lack of ethics. As an Enrollment Coach at Brandman University, our job is to see if Brandman is a good fit for prospects and to help them on the path to becoming admitted and registered. As of 8/5/15 I have 25 students registered for the

Fall I session.  Five of my coworker are beneath
that number of registers.  I feel that my numbers
speaks for itself.  I understand the purpose of
the call metric, which is to make sure we are
working efficiently and effectively.  I feel
mentioning my call time in my final warning
(especially with other [*sic*] not meeting their
expectation) is looking for charges against me to
dismiss me.  As I just stated, my inquiry to
registered numbers speak for itself.  I'm getting
the job done by connecting with student, [*sic*]
hearing and meeting their needs and moving them
forward.

My written notice has dates that go back to the
time when I was still understanding my role and
job description, a time when someone makes
mistakes because they are learning their duties;
since then I have improved.  I was given a plan of
corrective action and have met what was required
of me.  I've received more transfer call[s] from
the EA's [*sic*].  I've kept my Past-Due status to a
minimum.  I've sought assistance in answering
students concerns accurately.

On page l of my final written disciplinary, it
states, "data that was pulled showed that you
dispositioned calls "successful", when you
actually left voicemail.  I haven't seen proof of
that.  How do I know if that's accurate
information?  The 30-39 calls I supposedly made
was removed from the final written disciplinary
because there was no proof.  What's to say this
isn't the same error?

On page 2 of the final written warning on the
bottom it states, "On 7 /13 you were notified that
you neglected to submit (daily recap) for a full
week during the absence of your AD."  My AD did
not tell me who to submit my daily recap to.  This
was clearly a lack of direction on my AD['s] part,
which has been placed on the final warning.  I
have the actual email attached to this comment
sheet to verify that.

[Plaintiff's] Counsel Decl., Ex. 16 at 4-5.

    Chughtai received and investigated Plaintiff's complaints of

discrimination. She reviewed relevant documents and interviewed Plaintiff, Mumford, and Gelfand as well as Associate Vice Chancellor of Enrollment Operations Albert Salsa.

On September 11, 2015, Chughtai sent Plaintiff a six-page memorandum detailing her "investigative outcomes." Chughtai Decl., Ex. 2 at 2. In particular, Chughtai noted Plaintiff had expressed concerns that management had issued written warnings to him for infractions that he believed should have been first addressed by verbal counseling. Chughtai, however, explained Defendant's policy did not require management to issue verbal warnings before written warnings, and, in any event, Plaintiff received direct feedback every week during his "1:1" with his supervisors in addition to weekly scorecards that included feedback as far back as April 2015 that Plaintiff needed to improve his performance. As to Plaintiff's allegation that he was unfairly written up for things that occurred during his "introductory period," Chughtai noted management had provided him with coaching to improve his performance since October 2014, and "[w]hile some of those issues occurred during your introductory period, and while this period is a time for you to understand your role and job description, you are still held to performance expectations, and any unsatisfactory performance will still be addressed during an introductory period." Chughtai Decl., Ex. 2 at 3. Chughtai noted her investigation established Plaintiff's

performance had "improved in some metrics, but not others," and, therefore, Chughtai could not "substantiate that you are being held to unfair call time metrics." *Id.* at 4. Chughtai noted the reference to the 39 calls "was removed from [Plaintiff's] final written notice . . . not because there was no evidence, but because leadership wanted to give [Plaintiff] the benefit of the doubt that [he] did not know to change the number in the student record." *Id.* at 5. In any event, Gelfand and Mumford "spot checked a few records randomly on August 12, 2015, and quickly found three records where you had dispositioned a call as a voicemail when in fact you left no voicemail at all." *Id.* In addition, Gelfand and Mumford found other "calls that had continued after the student hung up, thus extending call time . . . . [Plaintiff] indicated that the vast majority of other staff members engage in the same misconduct, but [Chughtai's] investigation was unable to find any such other examples." *Id.* Chughtai found Plaintiff's complaint about failing to have someone to send his daily reports to for the week of July 13, 2015, was substantiated, but Chughtai noted Plaintiff also "did not submit the required daily recap for three days in June, and on 6/25 had to be reminded by your supervisor to send the daily recap." Chughtai stated she could not "substantiate any legitimate reason to excuse your failure to send daily reports on those days." *Id.* Chughtai also found other assertions by

Plaintiff about being discriminated against were unsubstantiated. For example, according to Plaintiff two Caucasian employees were taken off written notices "in a short manner of time" and that another coworker was not put on written notice even though he had missed "20+ days of work [and] has 100+ past due student in status." Chughtai noted she was not able to discuss disciplinary actions taken against other staff members, but she had fully investigated Plaintiff's concerns and did not find any violations or inconsistencies in the application of Defendant's policies to the employees at issue. Finally, Chughtai noted Plaintiff had "made improvements in several of the areas of [his] performance, including [his] registered students; however, [his] call quality and call time are still low and often below the team average, and [he] continue[s] to not implement the consultative sales framework." Chughtai Decl., Ex. 2 at 7. Chughtai noted Defendant would revise Plaintiff's final written disciplinary memorandum to remove the references to Plaintiff's failure to provide daily recaps for the week of July 13, 2015, and to the 39 calls made to the "unviable" number. Nevertheless, Chughtai concluded "there was no evidence to support that any unlawful discrimination has occurred because of race or other reason protected by law or Brandman policy." *Id.*

In November 2015 Plaintiff reported to Christopher Larson, Director of Quality Assurance, that two coworkers had made

race-based comments to Plaintiff.  JSAF at ¶ 75.  Specifically,
Plaintiff reported to Larson that during a training meeting the
enrollment coaches viewed a video clip of an African-American
child comedian known as Kid President.  Enrollment Coach Nathan
Dunkin said, "Oh, look.  Look at Demetrye."  Plaintiff asked
Dunkin:  "Why, because he's black?"  Dunkin responded:  "No
because he's just a little -- cute little kid, just, you know,
that's it.  Just simple."  JSAF at ¶ 75.  Plaintiff also reported
to Larson that Plaintiff had been "walking through a door with a
dark shirt on," and Enrollment Coach Anthony Potter said to him:
"You can't hide behind the door.  You're black.  You can't hide
behind this white wall."  JSAF at ¶ 75-76.  Larson told Plaintiff
that he would talk to Duncan and Potter, "take care of the
situation, and follow up with [Plaintiff]."  JSAF at ¶ 77.

Larson met with Duncan and Potter and counseled them about
making comments that Plaintiff found offensive.  Duncan and
Potter subsequently apologized to Plaintiff.  JSAF at ¶ 80.
Plaintiff was "satisfied with the response and felt that the
issue had been resolved."  JSAF at ¶ 81.  Plaintiff then sent
Larson an email in which he stated:  "Again, I want to thank you
for listening and taking care of the issues I had with Nathan and
Tony regarding the racial comments they've made.  I appreciate
you immediately delving into this issue, and rectify[ing] it."
JSAF at ¶ 82.

On January 28, 2016, Plaintiff was talking to Enrollment
Coach Scott Kobold.  Senior Enrollment Analyst Stephan Farnsworth
"leaned in and asked, 'what are you guys talking about?'"  JSAF
at ¶ 86.  Plaintiff "whispered to Farnsworth and Kobold, with a
smile on his face:  'I have a bomb.'"  JSAF at ¶ 87.  Plaintiff
then said he was joking and that he "shouldn't have said that."
JSAF at ¶ 88.  Plaintiff opened his bag and his desk drawers to
show Farnsworth and Kobold that he did not have a bomb and was
joking.  Farnsworth summarized the conversation in an email recap
provided to Larsen at 2:28 p.m. on January 28, 2016:

> As I walked back into my office and away from
> [Plaintiff's] desk, [Plaintiff] quietly said to me
> "hey, Steve, come here", I walked back over.  He
> said to me, with a small grin on his face, "I'm
> going to bomb this place".  Immediately shocked by
> what I heard I said back to him "what?", he said
> "I'm going to bomb this place . . . ."  All in a
> quiet tone as if to not scare people.  Again, I
> said to him "what?  Are you kidding?" and he said
> back:  "no, at 3pm".  I gave him a concerned
> glance while shaking my head, still with a
> half-smile since I was so caught off guard and we
> had just been joking.  He then immediately sat
> back in his chair, shook his head from side to
> side and said "I'm serious man, I'm serious".  I
> think that when he said this, he intended to say
> he was joking, but accidentally said he was
> serious.  Regardless of intent at that point I
> asked him if I needed to get HR involved, to which
> he said "no, no I'm kidding, see?  Look" he opened
> his backpack, drawers at his desk, etc. to
> demonstrate he had nothing with him that should be
> treated as a threat.  I asked him shortly after if
> I should get the building concierge, he again said
> "I'm kidding man", but then he went on to say
> "don't worry Steve, I'll give you 5 minutes notice
> so you can get out".

Chughtai Decl., Ex. 3 at 1.  Kobold described the conversation as
follows in an email sent to Larson at 2:51 p.m. on January 28,
2016:

> Sometime this afternoon around 12:30pm, I was
> engaged in a conversation that included myself,
> Steve Farnsworth and [Plaintiff].  The dialogue at
> this point was primarily between Steve and
> [Plaintiff] and was of a light nature; jokes and
> smiles were being exchanged.  Out of the blue,
> [Plaintiff] made a comment saying something to the
> effect of, "I'm going to bomb this place at 3
> o'clock".  Steve responded by saying, "Should I be
> calling HR?".  [Plaintiff] then said something
> like, "No, I'm just joking.  You can check my bag
> and my desk.  I don't have anything".

Chughtai Decl., Ex. 4 at 1.  After the conversation concluded,
Farnsworth went to the kitchen to get his lunch and returned to
his office.  Farnsworth testified at deposition that "the
potential gravity [of the conversation] started to set in with
[him]" after he returned to his desk.  Tripp Decl., Ex. 11 at 4.
At that point Larson came into Farnsworth's office and Farnsworth
"realized [he] needed someone to talk to about it," so he told
Larson about the conversation.  *Id*.

Larson and Farnsworth contacted their supervisor Albert
Sals,.  Salsa and Larson concluded Larson should contact Salsa's
supervisor, Executive Vice Chancellor for Enrollment and Student
Affairs Saskia Knight, as well as Defendant's Human Resources
Department.  Larson did so, and Knight contacted Associate Vice
Chancellor of Human Resources Learning and Development Sam
Bresler.  Bresler recommended Larson and Farnsworth contact the

15 – OPINION AND ORDER

building manager to determine the policy in this situation.  They

did so, and the building manager called 911.  Farnsworth and

Larson explained the situation to the 911 dispatcher, "including

the fact that [Plaintiff] said his comment was a joke."  JSAF at

¶ 98.

> A short time later, two police officers came to
> the coaching center, interviewed [Plaintiff],
> asking him "Did you make a joke about a bomb?"
> He responded that he was just kidding.  And they
> said, "Well, sir, you know, because of 9-11,
> people need to take these things seriously."  Then
> [Plaintiff] consented to a search of his bag.  The
> officers searched his bag and, according to
> [Plaintiff], said:  "You know what, you seem to be
> an okay guy, so you can't go back to work because
> people feel unprotected here."  The officers
> escorted him off the premises.

JSAF at ¶ 99.  After Plaintiff left the premises, "management

told the staff what had happened."  JSAF at ¶ 100.  Larson noted

in his recap of the incident written on January 28, 2016, that

after he advised the staff what had happened, "[t]wo staff

members then came to [him] to say they were uneasy with the

situation and uncomfortable being in the office after a bomb

threat even when in jest."  Chughtai Decl., Ex. 5 at 1.

Accordingly, at 2:15 p.m. Larson gave the coaching-center staff

the option to leave the office early that day, "and everyone

did."  JSAF at ¶ 101.  Defendant closed the coaching center for

the rest of the day.

Chughtai began an investigation into Plaintiff's bomb

comments.  She interviewed Plaintiff; reviewed written statements

from Farnsworth, Kobold, and Larson; and conducted follow-up interviews with Farnsworth and Kobold. JSAF at ¶¶ 103-06. Farnsworth and Kobold made clear that they believed Plaintiff was most likely joking when he made his bombing comment. Farnsworth, however, stated he "felt he had a 'professional responsibility' to report the statement because he was 'putting [himself] and the 20 other people that were [t]here at risk by not saying something.'" JSAF at ¶ 116. Kobold explained he believed Plaintiff's comment was a bad joke, but "it was 'something that you never want to say in an office setting . . . especially post-911.'" JSAF at ¶ 118.

On February 2, 2016, Chughtai sent Bresler a memorandum outlining her investigation and her conclusions and advised Bresler that Plaintiff's comments violated Defendant's Workplace Violence Policy, which provides Defendant has "zero tolerance for actual or threatened violence against co-workers, faculty, students, visitors, vendors, or any other persons." Suppl. Decl. of Matthew Tripp, Ex. 9 at 6. Chughtai noted Plaintiff's bomb comment had been taken seriously enough for Larson to "escalate[] it to [Defendant's] upper management," and building security "escalated it to the police authorities who took it seriously enough to escort [Plaintiff] out of the building." *Id.* In addition, "staff were concerned and alarmed enough that many of them requested to leave for the day. The ECC closed for the day

and the staff went home." *Id.* Chughtai also noted Plaintiff

"has been on a final warning since September 2015 for performance

related issues." *Id.* Ultimately, Chughtai recommended Defendant

terminate Plaintiff's employment. Bresler agreed with Chughtai's

recommendation and terminated Plaintiff's employment by letter on

February 3, 2016. JSAF at ¶ 123.

On January 16, 2017, Plaintiff filed a complaint with the

Oregon Bureau of Labor and Industries (BOLI) in which he alleged

Defendant terminated him on the basis of his race and/or in

"retaliation for making protected complaints of discrimination."

Tripp Decl., Ex. 13 at 2.

On February 11, 2016, Defendant filed a response to BOLI's

request for separation information in which Defendant specified

it terminated Plaintiff "due to performance" and because he

"failed to follow instructions/policy/contract." [Plaintiff's]

Counsel Decl., Ex. 71 at 2-3.

On July 14, 2017, Plaintiff filed a Complaint in this Court

against Defendant alleging claims for

   (1)  Race discrimination in violation of Title VII, 42

        U.S.C. § 2000e-2; 42 U.S.C. § 1981; and Oregon Revised

        Statutes § 659A.030(1)(a) and (b) and

   (2)  Retaliation against Plaintiff for opposing

        discrimination in violation of Title VII, 42 U.S.C.

        § 2000e-3; Oregon Revised Statutes § 659A.030(f); and

Oregon Revised Statutes § 659A.199.

On May 7, 2019, Defendant filed a Motion for Summary Judgment as to all of Plaintiff's claims. The Court took this matter under advisement on June 11, 2019.


## STANDARDS

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Washington Mut. Ins. v. United States*, 636 F.3d 1207, 1216 (9th Cir. 2011). *See also* Fed. R. Civ. P. 56(a). The moving party must show the absence of a genuine dispute as to a material fact. *Emeldi v. Univ. of Or.*, 673 F.3d 1218, 1223 (9th Cir. 2012). In response to a properly supported motion for summary judgment, the nonmoving party must go beyond the pleadings and point to "specific facts demonstrating the existence of genuine issues for trial." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). "This burden is not a light one. . . . The non-moving party must do more than show there is some 'metaphysical doubt' as to the material facts at issue." *Id.* (citation omitted).

A dispute as to a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002)(quoting *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248 (1986)).  The court must draw all reasonable inferences in favor of the nonmoving party.  *Sluimer v. Verity, Inc.*, 606 F.3d 584, 587 (9th Cir. 2010).  "Summary judgment cannot be granted where contrary inferences may be drawn from the evidence as to material issues."  *Easter v. Am. W. Fin.*, 381 F.3d 948, 957 (9th Cir. 2004)(citing *Sherman Oaks Med. Arts Ctr., Ltd. v. Carpenters Local Union No. 1936,* 680 F.2d 594, 598 (9th Cir. 1982)).

"A non-movant's bald assertions or a mere scintilla of evidence in his favor are both insufficient to withstand summary judgment."  *F.T.C. v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009)(citation omitted).  When the nonmoving party's claims are factually implausible, that party must "come forward with more persuasive evidence than otherwise would be necessary."  *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1137 (9th Cir. 2009) (citing *Blue Ridge Ins. Co. v. Stanewich*, 142 F.3d 1145, 1149 (9th Cir. 1998)).

The substantive law governing a claim or a defense determines whether a fact is material.  *Miller v. Glenn Miller Prod., Inc.*, 454 F.3d 975, 987 (9th Cir. 2006).  If the resolution of a factual dispute would not affect the outcome of the claim, the court may grant summary judgment.  *Id*.

**DISCUSSION**

As noted, Defendant moves for summary judgment as to both of Plaintiff's claims.

**I.   First Part of Plaintiff's First Claim for Race Discrimination in Violation of Title VII, 42 U.S.C. § 2000e-2; 42 U.S.C. § 1981; and Oregon Revised Statutes § 659A.030(1)(a) and (b)**

Plaintiff alleges in the first part of his First Claim that Defendant discriminated against him on the basis of his race in violation of Title VII, 42 U.S.C. § 2000e-2; 42 U.S.C. § 1981; and Oregon Revised Statutes § 659A.030(1)(a) and (b) when Defendant terminated Plaintiff's employment and when Defendant issued the Disciplinary Counseling Memoranda to Plaintiff.

Defendant, in turn, asserts it is entitled to summary judgment on the first part of Plaintiff's First Claim on the grounds that (1) plaintiff cannot establish a *prima facie* case of discrimination, (2) Defendant had legitimate, nondiscriminatory reasons for issuing the counseling memoranda to Plaintiff and terminating Plaintiff's employment, and (3) Plaintiff cannot establish a genuine dispute of material fact exists as to whether Defendant's reasons were pretext for discrimination.

**A.   Standards**

The Ninth Circuit recently reiterated "on a motion for summary judgment, [the court must] evaluate [a plaintiff's] Title VII racial . . . discrimination claim[] using the three-part

burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Pavel v. Univ. of Oregon*, No. 18-35287, 2019 WL 2295867, at *2 (9th Cir. May 29, 2019).  Under the *McDonnell Douglas* framework

> a plaintiff may establish a *prima facie* case of discrimination by demonstrating that:  (1) he is a member of a protected class; (2) he was qualified for his position and performing satisfactorily; (3) he experienced an adverse employment action, and (4) similarly situated individuals outside his protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination.

*Id.* (citing *Hawn v Exec. Jet Mgmt. Inc.*, 615 F.3d 1151, 1156 (9th Cir. 2010)).  "If a plaintiff establishes a *prima facie* showing of discrimination, 'the burden of production, but not persuasion, then shifts to the [defendant] to articulate some legitimate, non-discriminatory reason for the challenged action.'"  *Id.* (quoting *Hawn*, 615 F.3d at 1155).  If a defendant articulates a legitimate, nondiscriminatory reason for the challenged action, the plaintiff "'must then raise a triable issue of material fact as to whether the defendant's proffered reasons for [the plaintiff's] termination are mere pretext for unlawful discrimination.'"  *Id.* (quoting *Hawn*, 615 F.3d at 1155).

"Claims brought under 42 U.S.C. § 1981 and ORS 659A.030 are analyzed under the same legal standards" as those brought pursuant to Title VII.  *Gollah v. City of Millersburg*, No. 6:18-CV-01412-MC, 2018 WL 6183268, at *2 (D. Or. Nov. 27, 2018)(citing

*DeWeese v. Cascade Gen. Shipyard*, No. 08-cv-860-JE, 2011 WL

3298421, at *7 (D. Or. May 2, 2011)("The same legal standards

apply when analyzing claims brought pursuant to" ORS 659A.030,

42 U.S.C. § 1981, and Title VII.)). *See also Manatt v. Bank of

Am., NA*, 339 F.3d 792, 797 (9th Cir. 2003)("We also recognize

that those legal principles guiding a court in a Title VII

dispute apply with equal force in a § 1981 action.").

**B.    Plaintiff's Termination**

As noted, Plaintiff asserts in the first part of his

First Claim that Defendant discriminated against him on the basis

of his race in violation of Title VII, 42 U.S.C. § 2000e-2; 42

U.S.C. § 1981; and Oregon Revised Statutes § 659A.030(1) when

Defendant terminated his employment.  Defendant asserts Plaintiff

has not established a *prima facie* case of discrimination; that

Defendant had legitimate, nondiscriminatory reasons to terminate

Plaintiff's employment; and that Plaintiff has not established

Defendant's reasons were pretextual.

**1.    Plaintiff has not established a *prima facie* case
       of disparate treatment as to his termination.**

Defendant asserts Plaintiff cannot establish a

*prima facie* case of disparate treatment because Plaintiff cannot

establish there was any similarly-situated employee outside of

his protected class who was treated more favorably.  "To satisfy

[the similarly-situated employee] element, [the plaintiff] must

identify employees outside [his] race . . . who were similarly situated to [him] 'in all material respects' but who were given preferential treatment; they must 'have similar jobs and display similar conduct.'" *Campbell v. Haw. Dep't of Ed.*, 892 F.3d 1005, 1015 (9th Cir. 2018)(quoting *Nicholson v. Hyannis Air Serv., Inc.,* 580 F.3d 1116, 1125 (9th Cir. 2009)). The Ninth Circuit has held the "burden at [the *prima facie*] stage is 'not onerous'[; however, the plaintiff] must still produce some evidence to meet [his] burden." *Franett-Fergus v. Omak Sch. Dist. 19*, 743 F. App'x 855, 857 (9th Cir. 2018)(quoting *Lyons v. England*, 307 F.3d 1092, 1112 (9th Cir. 2002)).

Defendant asserts Plaintiff has not pointed to any employee outside of his protected class who was treated more favorably when he or she made a significant threat that concerned other employees to the extent that they reported it to management, that caused other employees to express concern about remaining in the office, that caused the office to be closed for half a day, and who was also under a Disciplinary Counseling Memorandum.

In his Response Plaintiff points to Megan Howell, another Enrollment Coach, who, according to Plaintiff, "jokingly threatened her coworkers" by saying she was going to kill them while drawing her hand across her throat, but Howell was not terminated. It is undisputed, however, that employees did not

report Howell's behavior to management or indicate her statements and actions caused anyone to feel they had a "professional responsibility" to report the statement because they could be "putting [themselves] and the 20 other people that were [at the office] at risk."  JSAF at ¶ 116.  The Ninth Circuit held in *Hawn* that conduct by an employee that results in complaints to management is not substantially similar to conduct by an employee that does not result in complaints.  615 F.3d at 1160.  The court further noted:  "We have distinguished misconduct by one employee from misconduct by another employee on the basis of whether it prompted complaints or consternation by other employees."  *Id*. Specifically, in *Hawn* the Ninth Circuit noted it held in *Meyer v. California and Hawaiian Sugar Company* that when "there was no evidence that the male employees' remarks had 'provoked anything comparable to the vigorous reaction' that resulted from the plaintiff's comments, the other incidents were 'not such parallels to her case as to raise a genuine issue of pretext.'" 615 F.3d at 1160 (quoting *Meyer,* 662 F.3d 637, 640 (9th Cir. 1981)).  The court also noted in *Hawn* that "[t]he presence of complaints has also been deemed a valid distinguishing factor by other circuits."  615 F.3d at 1160 (citing *Yeager v. City Water & Light Plant*, 454 F.3d 932, 934 (8th Cir. 2006), and *Morrow v. Wal-Mart Stores, Inc.*, 152 F.3d 559, 560 (7th Cir. 1998)).

In addition, it is undisputed that Howell's

alleged actions and statements did not cause police to come to the coaching center or cause the coaching center to close early. The Court concludes the fact that the nature of Plaintiff's comments caused employees to report them to management and caused other employees to report to management that they did not feel comfortable remaining at work reflects the conduct of Howell and Plaintiff was not "substantially similar."

Finally, even if the alleged statements and conduct of Howell and Plaintiff were substantially similar, the record reflects Howell did not have an extensive history of poor performance, any disciplinary counseling memoranda, or any written discipline.

On this record the Court concludes Plaintiff has not established a *prima facie* case of disparate treatment as to his termination because Plaintiff has not shown there was any similarly-situated employee outside of his protected class who was treated more favorably.

> **2. Defendant has articulated a legitimate, nondiscriminatory reason for terminating Plaintiff's employment.**

Even if Plaintiff established a *prima facie* case of disparate treatment as to his termination, Defendant asserts it had legitimate, nondiscriminatory reasons for terminating Plaintiff based on Plaintiff's bomb threat and poor performance.

As noted, when "a plaintiff establishes a *prima*

*facie* showing of discrimination, 'the burden of production, but not persuasion, then shifts to the [defendant] to articulate some legitimate, non-discriminatory reason for the challenged action.'" *Pavel*, 2019 WL 2295867, at *2 (quoting *Hawn*, 615 F.3d at 1155). Here Defendant asserts it terminated Plaintiff's employment for the bomb-threat comments and for his poor performance, which are both legitimate, nondiscriminatory reasons to terminate employment. *See, e.g., Nguyen v. Dep't of Navy*, 412 F. App'x 926, 929 (9th Cir. 2011)("Even assuming [the plaintiff] established a *prima facie* case, the record shows [the defendant] had legitimate, nondiscriminatory and nonretaliatory reasons for disciplining and ultimately removing [the plaintiff], including her substandard communications skills, low performance ratings and complaints from her customers, [and] poor attendance."); *Johnson v. AT&T Corp.*, 422 F.3d 756, 762 (8th Cir. 2005) (concluding the defendant's belief that the plaintiff had threatened to bomb its facility was a legitimate, nondiscriminatory reason to terminate the plaintiff's employment even if the defendant was mistaken in its belief).

On this record the Court concludes Defendant has articulated legitimate, nondiscriminatory reasons for terminating Plaintiff.

### 3. Plaintiff has not established Defendant's reasons were mere pretext.

As noted, when a defendant articulates legitimate,

nondiscriminatory reasons for the challenged action, the
plaintiff "'must then raise a triable issue of material fact as
to whether the defendant's proffered reasons for [the
plaintiff's] termination are mere pretext for unlawful
discrimination.'" *Pavel*, 2019 WL 2295867, at *2 (quoting *Hawn*,
615 F.3d at 1155).

Plaintiff asserts Defendant's stated reasons for
terminating him were mere pretext because Defendant provided
inconsistent explanations, Defendant did not follow its own
protocol when it terminated Plaintiff's employment, and Defendant
selectively enforced its Workplace Violence Policy.

### a. Defendant's Explanations for Terminating Plaintiff's Employment

Plaintiff asserts the inconsistency of
Defendant's explanations for terminating Plaintiff's employment
are evidence that those explanations are mere pretext.
Specifically, Plaintiff asserts Defendant told Plaintiff at the
time of his termination that he was terminated due to his
violation of Defendant's Workplace Violence Policy, but Defendant
told BOLI that Plaintiff was terminated for performance reasons
and Chughtai testified at deposition that Plaintiff was
terminated for both reasons.

When Chughtai recommended Plaintiff's
termination in February 2016, the record reflects Chughtai's
report noted Plaintiff's bomb comments as well as the fact that

Plaintiff "ha[d] been on a final warning since September 2015"
for performance-related issues. In addition, Defendant's
February 11, 2016, response to BOLI's request for separation
information specified Plaintiff was terminated "due to
performance" and his failure "to follow instructions/policy/
contract." [Plaintiff's] Counsel Decl., Ex. 71 at 2-3. The
record, therefore, reflects Defendant's reasons for terminating
Plaintiff's employment have been consistent: Plaintiff's bomb
comments and his inadequate performance. The Court, therefore,
concludes on this record that Plaintiff has failed to establish
the alleged discrepancies that provide an inference of pretext.

### b. Defendant's Protocol in Terminating Plaintiff's Employment

Plaintiff also asserts Defendant's stated
reasons for Plaintiff's termination are mere pretext because
Defendant did not follow its own protocol when it terminated
Plaintiff.

The Ninth Circuit has held: "'A plaintiff
may . . . raise a triable issue of pretext through evidence that
an employer's deviation from established policy or practice
worked to [his] disadvantage.'" *Merrick v. Hilton Worldwide,
Inc.*, 867 F.3d 1139, 1149 (9th Cir. 2017)(quoting *Earl v. Nielsen
Media Research, Inc.*, 658 F.3d 1108, 1112 (9th Cir. 2011)). "But
such a deviation must be considered in context and may not always
be sufficient to infer a discriminatory motive." *Merrick*, 867

F.3d at 1149 (citation omitted).

Plaintiff asserts Chief Financial Officer and
Executive Vice Chancellor of Finance and Administration Phillip
Doolittle was not consulted about the decision to terminate
Plaintiff's employment until after Plaintiff was terminated,
which is in violation of Defendant's policies.  Plaintiff relies
on a February 3, 2016, email from Doolittle to Bresler in which
Doolittle states:

> Dina advised me on the personnel action being
> taken in Portland.  It is probably the right
> action, but I thought that you and I had
> agreed from an internal protocol perspective
> that all employee terminations would be
> reviewed by me before implementation.

Decl. of Phillip Doolittle, Ex. 1 at 2.  Defendant, however,
notes Doolittle also states in his February 3, 2016, email:  "I
am hearing . . . that we are closing one of our campuses (LA) and
laying off two of [*sic*] employees.  Again, I have not been
briefed on the termination planning for these two employees."
Doolittle Decl., Ex. 1 at 2.  In addition, Bresler testified at
deposition that there were "one or two instances where
[Doolittle] might have been on vacation, or otherwise
unavailable" and Defendant terminated employees without
consulting Doolittle first.  Tripp Suppl. Decl., Ex. 8.  Thus,
although it may have been internal protocol, the record reflects
Doolittle was not consulted before every employee termination.

In addition, Defendant asserts the deviation

from Defendant's internal protocol did not "work to [Plaintiff's] disadvantage" because Doolittle states in his February 3, 2016, email that he "did not disagree with the decision to terminate [Plaintiff's] employment" and it was "probably the right action." Doolittle Decl. at ¶ 4; Doolittle Decl., Ex. 1 at 2. Thus, even if Doolittle had been consulted in advance of Plaintiff's termination, Defendant still would have terminated Plaintiff.

The Court, therefore, concludes on this record that Defendant's failure to follow internal protocol when "considered in context" does not support an inference that Defendant's stated reasons for terminating Plaintiff's employment were mere pretext.

### c. Defendant's Selective Enforcement of Its Workplace Violence Policy

Plaintiff alleges Defendant selectively enforced its Workplace Violence Policy, which raises an inference that Defendant's stated reasons for terminating Plaintiff's employment were mere pretext.

Defendant's Workplace Violence Policy provides:

> [T]he University has established a policy that provides "zero tolerance" for actual or threatened violence against co-workers, faculty, students, visitors, vendors, or any other persons who are either on our premises or have contact with employees in the course of their duties.

* * *

Threatening behavior *may* include but is not
limited to:

- Throwing objects
- Making a verbal threat to harm another
  individual or destroy property
- Making menacing gestures
- Verbalizing grudges against co-workers
- Attempting to intimidate individuals
- Behavior indicating that the individual
  may pose a danger either to himself or
  herself or to others
- Engaging in shouting, threatening
  gestures or physical contact,
- Bringing firearms or weapons of any kind
  onto the premises.

Employees who become aware of any threat or
act of workplace violence must immediately
report the incident to a supervisor and to
Human Resources. If an employee feels at
risk, he or she should contact local law
enforcement authorities by dialing 911.

Chughtai Dep., Ex. 8 at 1 (emphasis added).

Plaintiff alleges the record reflects there
were multiple violations of Defendant's Workplace Violence Policy
by Caucasians that did not result in discipline. In fact,
Plaintiff points to testimony that individuals outside of
Plaintiff's class were not disciplined for violating the
Workplace Violence Policy when they threw balls, bean bags, and
paper airplanes in the workplace; brought mace into the office;
and threatened to kill another employee.

Defendant notes its Workplace Violence Policy
states threatening behavior *may* include throwing objects or
bringing weapons to work. "May" indicates the context in which

those things occur is important.  The record reflects people in
Plaintiff's workplace threw balls, beanbags, and paper airplanes
only when playing games.  *See* Kobold Dep. at 14-15; Mumford Dep.
at 26.  In addition, there is not any indication in the record
that any employee complained to management or reported feeling
unsafe due to employees throwing balls, beanbags, or paper
airplanes.  Although some employees brought mace to the office,
the record reflects the employees who did so were "young, female
employees who . . . [took] public transit and [had mace] for
personal safety."  Mumford Dep. at 25.  The record does not
reflect any employee complained to management or reported feeling
unsafe due to employees bringing mace to the office.  In
addition, the threat to kill another employee was by Megan
Howell, who, according to Plaintiff, "jokingly threatened her
coworkers" by saying she was going to kill them while drawing her
hand across her throat.  As the Court noted earlier, it is
undisputed that employees did not report Howell's behavior to
management or indicate her statements and actions caused any
employee to feel threatened, nervous, or unsafe.

On this record the Court concludes Defendant
did not selectively enforce its Workplace Violence Policy in such
a way that supports an inference that Defendant's stated reasons
for terminating Plaintiff were mere pretext.

In summary, the Court concludes on this record that

Plaintiff has not "raise[d] a triable issue of material fact as to whether the defendant's proffered reasons for [the plaintiff's] termination are mere pretext for unlawful discrimination."  Accordingly, the Court grants Defendant's Motion for Summary Judgment as to the first part of Plaintiff's First Claim in which he alleges Defendant discriminated against Plaintiff on the basis of his race in violation of Title VII, 42 U.S.C. § 2000e-2; 42 U.S.C. § 1981; and Oregon Revised Statutes § 659A.030(1)(a) and (b) when it terminated his employment.

### C.  Disciplinary Counseling Memoranda

Plaintiff also alleges in the first part of his First Claim that Defendant discriminated against him on the basis of his race in violation of Title VII, 42 U.S.C. § 2000e-2; 42 U.S.C. § 1981; and Oregon Revised Statutes § 659A.030(1) when it issued the Disciplinary Counseling Memoranda.

Defendant asserts it is entitled to summary judgment on this part of Plaintiff's First Claim because there is not any evidence that the Disciplinary Counseling Memoranda constituted adverse employment actions, that Defendant treated Plaintiff differently than similarly-situated employees outside of his class, or that Defendant's reasons for issuing the Disciplinary Counseling Memoranda to Plaintiff were mere pretext.

As noted, to establish a *prima facie* case of employment discrimination a plaintiff must show he "'experienced an adverse

employment action.'" *Pavel*, 2019 WL 2295867, at *2 (quoting *Hawn*, 615 F.3d at 1155).  An "adverse employment action is one that 'materially affect[s] the compensation, terms, conditions, or privileges of . . . employment.'" *Bastidas v. Good Samaritan Hosp. LP,* No. 17-16432, 2019 WL 2156430, at *1 (9th Cir. May 16, 2019)(quoting *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008)).

Defendant asserts the Disciplinary Counseling Memoranda issued to Plaintiff were not adverse employment actions because they did not result in demotions, loss of pay, loss or decrease in work privileges, or ineligibility for promotion.  Plaintiff does not address Defendant's assertion that the Disciplinary Counseling Memoranda were not adverse employment actions nor does he identify any way in which the Disciplinary Counseling Memoranda materially affected the compensation, terms, conditions, or privileges of his employment.

Courts have concluded "[w]ritten warnings are generally 'not adverse employment actions where they do not materially affect the terms and conditions of employment.'" *Neely v. Boeing Co.*, No. C16-1791-JCC, 2019 WL 2178648, at *6 (W.D. Wash. May 20, 2019)(quoting *Sanchez v. Cal.*, 90 F. Supp. 3d 1036, 1056 (E.D. Cal. 2015)).  *See also Grimmett v. Knife River Corp.-Northwest*, No. CV-10-241-HU, 2011 WL 841149, at *9 (D. Or. Mar. 8, 2011) (concluding a written warning was not an adverse employment

action in a race-discrimination case); *Hoang v. Wells Fargo Bank, N.A.*, 724 F. Supp. 2d 1094 (D. Or. 2010)(concluding a warning letter that did not implement material change in the terms and conditions of the plaintiff's employment was not by itself an adverse employment action).

The Court concludes on this record that Plaintiff has not established a genuine dispute of material fact exists as to whether the Disciplinary Counseling Memoranda were adverse employment actions. The Court, therefore, concludes Plaintiff has not established a *prima facie* case of discrimination with respect to issuance of the Disciplinary Counsel Memoranda.

Accordingly, the Court grants Defendant's Motion for Summary Judgment as to that portion of Plaintiff's First Claim in which he alleges Defendant discriminated against him on the basis of his race in violation of Title VII, 42 U.S.C. § 2000e-2; 42 U.S.C. § 1981; and Oregon Revised Statutes § 659A.030(1) when it issued the Disciplinary Counseling Memoranda.

In summary, the Court grants Defendant's Motion for Summary Judgment as to the first part of Plaintiff's First Claim for race discrimination.

## II. Second Part of Plaintiff's First Claim for Race Discrimination in Violation of Title VII, 42 U.S.C. § 2000e-2; 42 U.S.C. § 1981; and Oregon Revised Statutes § 659A.030(1)(a) and (b)

In the second part of Plaintiff's First Claim for race discrimination Plaintiff alleges Defendant discriminated against

36 - OPINION AND ORDER

him on the basis of his race in violation of Title VII, 42 U.S.C.
§ 2000e-2; 42 U.S.C. § 1981; and Oregon Revised Statutes
§ 659A.030(1)(a) and (b) when it subjected him to a hostile work
environment.

A.    **The Law**

"To establish a [hostile work environment] *prima facie*
case, [the plaintiff] must be able to show that, because of [his]
race . . . [he] was subjected to unwelcome conduct that was
'sufficiently severe or pervasive to alter the conditions of
[her] employment and create an abusive working environment.'"
*Campbell v. Haw. Dep't of Ed.*, 892 F.3d 1005, 1016-17 (9th Cir.
2018)(quoting *Fuller v. Idaho Dep't of Corr.*, 865 F.3d 1154, 1161
(9th Cir. 2017)).  "The work environment must be both
subjectively and objectively perceived as abusive."  *Campbell*,
892 F.3d at 1017.  The Court must "consider all circumstances,
with a particular focus on issues such as the frequency and
severity of the conduct, whether the conduct was physically
threatening or humiliating, and the extent to which it
unreasonably interfered with [the plaintiff's] work performance."
*Id.*

The plaintiff "must also be able to show that the
[employer] is liable for the harassment that caused the hostile
environment to exist."  *Campbell*, 892 F.3d at 1017 (quotation
omitted).  An employer "may be held to account for [employee's]

actions only if, after learning of the harassment, [management] failed to take prompt corrective measures that were reasonably calculated to end the harassment." *Id.* (quotation omitted). The Ninth Circuit explained in *Campbell*:

> The most significant immediate measure an employer can take in response to a sexual harassment complaint is to launch a prompt investigation to determine whether the complaint is justified . . . . Such an investigation, itself, is a warning, not by words but by action that puts all parties on notice that [the employer] takes such allegations seriously and will not tolerate harassment in the workplace. Even where a complaint is found to be true, sometimes counseling or formally warning the perpetrator may be a sufficient response if the circumstances suggest that such action is reasonably expected to end the problem. . . . Of course, if the harassment continues, then the employer may need to escalate to more aggressive disciplinary measures as less severe measures prove inadequate.

892 F.3d at 1018 (quotations and citations omitted).

## B. Statements Made by Coworkers

At deposition Plaintiff asserted his claim for hostile work environment was based on five incidents:

(1) "On . . . February 26, 2015, a coworker told [Plaintiff] that he was "the whitest black guy [she] know[s]."

(2) "On . . . June 4, 2015, Potter made a reference to [Plaintiff] playing basketball, and [Plaintiff] believed it was made because he is African American."

(3) "At some point, Potter said that [Plaintiff] looked

like Wesley Snipes."

    (4)    In November 2015 Enrollment Coach Nathan Dunkin said: "Oh, look. Look at Demetrye." Plaintiff asked Dunkin: "Why, because he's black?" Dunkin responded: "No because he's just a little -- cute little kid, just, you know, that's it. Just simple."

    (5)    In November 2015 Enrollment Coach Anthony Potter said to Plaintiff: "You can't hide behind the door. You're black. You can't hide behind this white wall."

JSAF at ¶ 83.

The Ninth Circuit has held statements and actions significantly more severe and pervasive than the ones made by Plaintiff's coworkers and supervisors were insufficient to establish a hostile work environment. For example, in *Manatt v. Bank of America, NA*, the plaintiff's coworkers pulled their eyes back with their fingers to imitate or mock the appearance of Asians on several occasions; a coworker said to the plaintiff: "China woman, China woman, China woman, get your butt over here"; a coworker ridiculed the plaintiff in front of other coworkers for the way the plaintiff pronounced "Lima," and the coworkers laughed and said: "That's because she's a China woman"; a coworker said to the plaintiff's supervisor: "I am not a China man, I'm not like China men with their eyes like that," and the supervisor smiled in response; the plaintiff's supervisor told

her: "I've had the worst kind of trouble with your countrymen";
the plaintiff's coworkers made derogatory references to
"rickshaw[s]"; the plaintiff's coworkers used the phrase "China
man" in a joking manner on multiple occasions; and the
plaintiff's coworkers referred to Chinese people as "those
communists from Beijing." 339 F.3d 792, 795-96. The Ninth
Circuit noted Title VII "is not a general civility code," and
"simple teasing, offhand comments, and isolated incidents (unless
extremely serious) will not amount to discriminatory changes in
the 'terms and conditions of employment.'" *Id*. (quotations
omitted). The Ninth Circuit concluded the conduct alleged by the
plaintiff "f[ell] into the 'simple teasing' and 'offhand
comments' category of non-actionable discrimination" and,
therefore, did not create a hostile work environment. *Id*. at
798. *See also EEOC v. Prospect Airport Servs., Inc.*, 621 F.3d
991, 998 (9th Cir. 2010)("A violation is not established merely
by evidence showing sporadic use of abusive language, gender-
related jokes, and occasional teasing."); *Vasquez v. Cty. of Los
Angeles*, 307 F.3d 884, 893 (9th Cir. 2002)(the plaintiff failed
to establish a hostile environment claim when he was told he had
"a typical Hispanic macho attitude," that he should work in the
field because "Hispanics do good in the field," and he was yelled
at in front of others); *Kortan v. Cal. Youth Auth.*, 217 F.3d
1104, 1111 (9th Cir. 2000)(the plaintiff did not establish a

hostile work environment claim when her supervisor referred to females as "castrating bitches," "Madonnas," or "Regina" in front of the plaintiff on several occasions and called plaintiff "Medea").  Based on the above cases, the Court concludes Plaintiff has not established conduct by Defendant that was "sufficiently severe or pervasive to alter the conditions of [Plaintiff's] employment and create an abusive working environment."

In addition, even if these statements were sufficiently severe and pervasive to constitute a claim for hostile work environment, the record reflects Plaintiff did not report statements 1-3 to a member of Defendant's Human Resources Department or to a manager.  Defendant has a Policy Prohibiting Harassment that was provided to Plaintiff when he began his employment.  The Policy provides any employee who believes he has been subject to harassment should inform his immediate supervisor, "a management representative of [Defendant]," the Employee Relations Manager, or the Associate Vice Chancellor of Human Resources.  Tripp Decl., Ex. 15 at 31.  As noted, Plaintiff did not report these statements to any of the individuals set out in the Policy or to any other management personnel.  Moreover, the Ninth Circuit has made clear that an employer "may be held to account for [employee's] actions only if, after learning of the harassment, [management] failed to take prompt corrective

measures that were reasonably calculated to end the harassment."
*Campbell*, 892 F.3d at 1017 (quotation omitted).  Here there is
not any evidence from which the Court can infer Defendant knew or
should have known about statements 1-3.  The Court, therefore,
concludes Defendant "may [not] be held to account for" statements
1-3.

Plaintiff, however, reported statements 4 and 5 in
November 2015 to Larson, who is a manager.  Larson met with both
Duncan and Potter, counseled them on making offensive comments,
and warned them that their comments to Plaintiff were
inappropriate and offensive.  Subsequently Duncan and Potter both
apologized to Plaintiff.  Plaintiff was "satisfied with the
response and felt that the issue had been resolved."  JSAF at
¶ 81.  Plaintiff then sent Larson an email in which he stated:
"Again, I want to thank you for listening and taking care of the
issues I had with Nathan and Tony regarding the racial comments
they've made.  I appreciate you immediately delving into this
issue, and rectify[ing] it."  JSAF at ¶ 82.  The Ninth Circuit
has stated even when "a complaint is found to be true, sometimes
counseling or formally warning the perpetrator may be a
sufficient response if the circumstances suggest that such action
is reasonably expected to end the problem."  *Campbell*, 892 F.3d
at 1018.  Here the record does not show Duncan and/or Potter made
any further offensive comments to Plaintiff, and, therefore,

there is not any indication that Defendant needed "to escalate to more aggressive disciplinary measures" to address the conduct by Plaintiff's coworkers. Thus, even if statements 4 and 5 had been sufficiently severe and pervasive to support a claim for hostile work environment, Plaintiff has not established Defendant failed to take sufficient action to address the situation.

Accordingly, the Court grants Defendant's Motion for Summary Judgment as to the second part of Plaintiff's First Claim to the extent that it is based on these statements.

### C.    Implicit Bias

In his Response to Defendant's Motion for Summary Judgment Plaintiff asserts his claim of hostile work environment is also based on a "hidden or implicit bias and the effect it can have in disproportionate discipline or disparate enforcement of policies." Pl.'s Resp. at 32. Plaintiff does not cite any authority nor could this Court find any authority that a hidden or implicit bias can support a claim for hostile work environment. In addition, Plaintiff does not cite to evidence in the record that shows any alleged hidden or implicit bias resulted in an environment of the kind that the Ninth Circuit has concluded constitutes a hostile work environment. Accordingly, the Court grants Defendant's Motion for Summary Judgment as to the second part of Plaintiff's First Claim to the extent that it is based on an alleged implicit or hidden bias.

In summary, the Court grants Defendant's Motion for Summary Judgment as to the second part of Plaintiff's First Claim for a hostile work environment.

## III. Plaintiff's Second Claim for Retaliation for Opposing Discrimination in Violation of Title VII, 42 U.S.C. § 2000e-3; Oregon Revised Statutes § 659A.030(f); and Oregon Revised Statutes § 659A.199

In his Second Claim he alleges Defendant retaliated against him for opposing discrimination in violation of Title VII, 42 U.S.C. § 2000e-3; Oregon Revised Statutes § 659A.030(f); and Oregon Revised Statutes § 659A.199. Specifically, Plaintiff alleges Defendant terminated Plaintiff's employment in retaliation for making his August 6, 2015, complaint of discrimination.

Defendant asserts it is entitled to summary judgment on Plaintiff's Second Claim on the grounds that Plaintiff cannot establish a causal link between his August 6, 2015, complaint and his termination; that Defendant had legitimate, nondiscriminatory reasons for terminating Plaintiff's employment; and that Plaintiff cannot establish a genuine dispute of material fact exists as to whether Defendant's reasons were pretext for retaliation.

### A.    The Law

To establish a *prima facie* case of retaliation under Title VII,  42 U.S.C. § 2000e-3; Oregon Revised Statutes

§ 659A.030(1)(f); and Oregon Revised Statutes § 659A.199 "a plaintiff must demonstrate: '(1) [he] was engaging in protected activity, (2) the employer subjected [him] to an adverse employment decision, and (3) there was a causal link between the protected activity and the employer's action.'" *Branford v. Wa. Cty., Oregon*, No. 3:17- CV-94-SI, 2019 WL 1957951, at *15 (D. Or. May 2, 2019)(quoting *Pool v. VanRheen*, 297 F.3d 899, 910 (9th Cir. 2002)). *See also Tornabene v. N.W. Permanente, P.C.,* 156 F. Supp. 3d 1234, 1242 (D. Or. 2015)("The substantive analysis for discrimination under Title VII . . . and ORS § 659A.030 . . . is substantially similar, and courts often analyze such claims together."); *Larmanger v. Kaiser Found. Health Plan of the N.W.,* 895 F. Supp. 3d 1033, 1053 (D. Or. 2012)("The elements of a *prima facie* case under § 659A.030(1)(f) and the analysis of a claim under that statute do not differ in any substantive way from the standards that govern or the analysis that applies to Plaintiff's other whistleblowing and retaliation claims" under Title VII and § 659A.199.).

To establish causation the plaintiff must show his protected activity was a "'substantial factor in the motivation to discharge the employee.'" *Sandberg v. City of North Plains*, No. 10-CV-1273-HZ, 2012 WL 602434, at *7 (Feb. 22, 2012)(quoting *Estes v. Lewis and Clark Coll.,* 152 Or. App. 372, 381 (1998)). *See also Huff v. City of Portland*, Civ. No. 05-1831-AA, 2008 WL

1902760, at *6 (D. Or. Apr. 28, 2008)("Plaintiff bears the burden of establishing that her alleged disclosures constituted 'a substantial factor' in the discontinuation of her employment."). "[T]o be a substantial factor, the employer's wrongful purpose must have been 'a factor that made a difference' in the discharge decision." *Estes*, 152 Or. App. at 381 (citing *Nelson v. Emerald People's Util. Dist.*, 116 Or. App. 366, 373 (1992)).

If the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to rebut the inference of retaliation by offering a legitimate, nondiscriminatory reason for the employee's termination. If the defendant successfully rebuts the inference of retaliation, the burden of production shifts back to the plaintiff to show that the defendant's explanation is merely a pretext for impermissible retaliation. *Neighorn v. Quest Health Care*, No. 1:10-CV-03105-CL, 2012 WL 1566176, at *28 (D. Or. May 2, 2012). *See also Dawson v. Entek Int'l*, 630 F.3d 928, 936 (9ᵗʰ Cir. 2011)(*McDonnell-Douglas* burden-shifting framework applies to state and federal claims).

### B. Causal link

As noted, Defendant asserts Plaintiff cannot establish a causal link between his August 6, 2015, complaint of discrimination and his February 3, 2016, termination. Plaintiff, however, asserts a causal connection between his complaint and his termination can be inferred from the temporal proximity of

the two events.

        "A plaintiff can establish a causal connection between her protected activity and the adverse employment action . . . indirectly, by showing that the protected activity was followed closely by" the adverse employment action. *Huitt v. Optum Health Servs.*, 216 F. Supp. 3d 1179, 1193 (D. Or. 2016). "Courts[, however,] have made clear that when a plaintiff 'attempts to establish the causal connection indirectly [by] relying on mere temporal proximity between the events, the events must be 'very close' in time." *Id.* (quoting *Boynton-Burns v. Univ. of Or.*, 197 Or. App. 373, 380-81 (2005)). For example, in *Pavel* the Ninth Circuit held "a temporal proximity of three months is by itself insufficient circumstantial evidence to defeat a motion for summary judgment." 2019 WL 2295867, at *2. Similarly, in *Miller v. Clark County School District* the Ninth Circuit held the plaintiff failed to establish that a genuine dispute of material fact existed as to whether his protected conduct was a motivating factor in his termination when the plaintiff engaged in the allegedly protected activity "more than a month" before the defendant terminated his employment "for insubordination." 378 F. App'x 623, 626 (9th Cir. 2010). Similarly, in *Swan v. Bank of America* the Ninth Circuit concluded the plaintiff could not establish her termination was "causally related" to her medical leave because the defendant terminated

the plaintiff's employment "four months after her return from
leave, which is too remote in time to support a finding of
causation premised solely on temporal proximity." 360 F. App'x
903, 906 (9th Cir. 2009)(citing *Clark Cty. Sch. Dist. v. Breeden*,
532 U.S. 268, 273 (2001)). *See also Redwind v. W. Union, LLC*,
No. 3:14-CV-01699-AC, 2016 WL 3606595, at *19 (D. Or. May 2,
2016)(concluding five months between the protected activity and
the adverse employment action is insufficient temporal proximity
to support a finding of causation); *Talbot v. New Seasons Mkt.,
LLC*, No. 03:12-CV-00141-HZ, 2012 WL 6738271, at *7 (D. Or.
Dec. 27, 2012)(concluding two months between the protected
activity and the adverse employment action is insufficient
temporal proximity to support a finding of causation); *Kadiyan v.
Medtronic,* No. CV1005921MMMMANX, 2011 WL 13142145, at *15 (C.D.
Cal. Apr. 8, 2011)(concluding six months between the protected
activity and the adverse employment action is insufficient
temporal proximity to support a finding of causation). In
several cases district courts in the Ninth Circuit have concluded
even longer periods such as seven to nine months between the
protected activity and the adverse action does not constitute
sufficient temporal proximity to establish a causal connection.
*See, e.g., Anderson v. City and Cty. of San Francisco*, 169 F.
Supp. 3d 995, 1028 (N.D. Cal. Mar. 14, 2106)(seven months is
insufficient); *Santa Ana Police Officers Ass'n v. City of Santa*

*Ana*, No: SA CV 15-1280-DOC(DFMx), 2016 WL 827750, at *12 (C.D. Cal. Mar. 2, 2016)(eight months is insufficient).

Here there were six months between the time Plaintiff made his August 2015 complaint of discrimination and February 2016 when Defendant terminated his employment. Thus, the Court concludes Plaintiff's discrimination complaint and his termination are not sufficiently close in time to establish a causal connection between his protected activity and the adverse employment action.

In his Response to Defendant's Motion for Summary Judgment Plaintiff also asserts his complaints to Larsen in November 2015 are sufficiently close in time to his termination to establish a causal connection. The record, however, reflects none of the individuals who were involved in the decision to terminate Plaintiff's employment were aware of Plaintiff's November 2015 report to Larsen. *See* Chughtai Dep. at 44-46; Knight Dep. at 41. The Ninth Circuit has made clear that in order to support a causal connection between protected activity and an adverse employment action, the plaintiff must establish the decision-maker was aware of the protected activity. *See, e.g., Raad v. Fairbanks N. Star Borough Sch. Dist.*, 323 F.3d 1185, 1197-98 (9th Cir. 2003)("In order to prevail, [the plaintiff] must present evidence from which a reasonable trier of fact could conclude that the school principals who refused to

hire her were aware that she had engaged in protected activity."); *Stephens v. Nike*, 611 F. App'x 896, 897 (9th Cir. 2015)("The district court properly granted summary judgment on the federal retaliation claims . . . because [the plaintiff] failed to raise a genuine dispute of material fact as to whether the relevant decision maker was aware of his protected activity."); *Christian v. Umpqua Bank*, No. 3:16-CV-01938-BR, 2018 WL 2326604, at *8 (D. Or. May 22, 2018)("Evidence that a decision-maker is aware of an employee's protected activity is required to support a claim of retaliation.").

The Court, therefore, concludes on this record that Plaintiff has not established a genuine dispute of material fact exists as to the causal connection between either his August 2015 or his November 2015 discrimination complaints and his February 2016 termination.

## C. Legitimate, Nondiscriminatory Reason and Pretext

Even if either the six months between Plaintiff's August 2015 discrimination complaint and his termination is close enough in time to constitute a causal connection between his complaints and his termination and even if Plaintiff could establish the relevant decision-makers were aware of his November 2015 complaint to Larsen, the Court has already concluded Defendant has provided legitimate, nondiscriminatory reasons for Plaintiff's termination: *i.e.*, his bomb comments and his poor

performance.

Plaintiff relies on the same facts and evidence to support his Second Claim for retaliation that he relied on to support his First Claim for race discrimination.  For the same reasons that the Court concluded these facts and evidence do not support a finding that Defendant's reasons for terminating Plaintiff were pretextual as asserted in Plaintiff's discrimination claim, the Court concludes they do not support a finding of pretext in Plaintiff's retaliation claim.

In summary, the Court concludes Plaintiff has not established a causal connection between any of his discrimination complaints and his termination nor has Plaintiff established Defendant's legitimate, nondiscriminatory reasons for terminating Plaintiff's employment were pretextual.

Accordingly, the Court grants Defendant's Motion for Summary Judgment as to Plaintiff's Second Claim for retaliation.

## CONCLUSION

For these reasons, the Court **GRANTS** Defendant's Motion (#51) for Summary Judgment and **DISMISSES** this matter **with prejudice**.

IT IS SO ORDERED.

DATED this 5th day of August, 2019.

/s/ Anna J. Brown

_____
ANNA J. BROWN
United States Senior District Judge